UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) 21 CR 222 |
| v. | ) |
| | ) Judge Steven C. Seeger |
| CARNAIL JONES | ) |
| | ) |

**AMENDED GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS**

On April 14, 2020, agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives recovered a loaded firearm from defendant Carnail Jones's jacket pocket. During a post-arrest interview, Jones admitted to possessing the firearm. Jones is charged in this case with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Jones now moves to suppress the firearm and his confession. Jones claims that law enforcement lacked a legal basis to stop and search him. As such, Jones argues that the firearm was obtained in violation of the Fourth Amendment. Jones also maintains that an evidentiary hearing is necessary to resolve an unspecified factual dispute.

The court should deny Jones's motion to suppress without an evidentiary hearing. The undisputed facts establish that law enforcement observed Jones engage in an apparent firearms transaction with the target of a firearms trafficking investigation. The totality of the circumstances provided ATF with a reasonable basis for conducting an investigatory stop and protective search for weapons.

1

I.  **FACTUAL BACKGROUND**

As discussed in more detail below, in April 2020, ATF was investigating the illegal trafficking of firearms from Mississippi into Chicago. At around 1:30 a.m. on April 14, two of the Mississippi targets delivered firearms to a third target in Chicago. Exhibit 3 (ATF Report of Investigation), ¶¶ 1–6. The transaction took place inside 1818 South Hamlin Avenue in Chicago. Exhibit 3, ¶ 6. Shortly thereafter, ATF stopped and interviewed the Mississippi targets, both of whom admitted that they had just delivered firearms to the Chicago target. Exhibit 3, ¶¶ 7–8; Exhibit 4 (ATF Report of Investigation), ¶¶ 3–5; Exhibit 5 (ATF Report of Investigation), ¶¶ 3–4. One of the Mississippi targets showed ATF a photograph of the four firearms that he sold to the Chicago target. Exhibit 4, ¶ 5. About an hour later, law enforcement observed two men briefly go inside 1818 South Hamlin Avenue and then depart from the scene in an Uber. Exhibit 6 (ATF Report of Investigation), ¶¶ 2–3. When law enforcement pulled over and searched the Uber, law enforcement recovered one of the four firearms that the Mississippi targets had just delivered to the Chicago target. Exhibit 6, ¶ 4. At approximately 8:45 a.m., law enforcement observed Jones meet briefly with the Chicago target at 1818 South Hamlin Avenue and then depart from the scene in a blue Toyota Corolla. Exhibit 8 (ATF Report of Interview), ¶¶ 2–5. Law enforcement pulled Jones's car over. Exhibit 8, ¶ 6. One of the officers asked Jones, "You have anything on you?" Exhibit 8, ¶ 7. While motioning toward his right side with his head, Jones responded, "Yeah, in my pocket." Exhibit 8, ¶ 7. The officer

conducted a protective pat-down search for weapons and recovered a loaded firearm from Jones's jacket pocket. Exhibit 8, ¶ 7. Jones subsequently admitted to purchasing the firearm from the Chicago target. Exhibit 8, ¶ 9.

### A. ATF's Firearms Trafficking Investigation

ATF was investigating the illegal trafficking of firearms from Mississippi into Chicago by, among others, Mississippi residents Individual A and Eric Seals, neither of whom was a licensed firearms dealer. A summary reflecting what ATF knew in mid-April 2020 about their firearms purchases is attached as Exhibit 1 (ATF Report of Investigation).

Between in or around March 2019 and in or around March 2020, Individual A purchased approximately 42 firearms from various federal firearms licensed dealers (FFLs) in Mississippi. Exhibit 1, ¶ 1. 23 of the firearms were purchased on six distinct days in March 2020. Exhibit 1, ¶ 1. As of April 14, 2020, ATF was aware that at least four of the firearms that Individual A purchased in Mississippi had been recovered by law enforcement in Chicago; the time between these purchases and recoveries ranged from 48 days to 190 days. Exhibit 1, ¶ 1.

Individual A's cell phone and Seals's cell phone contacted each other over 100 times in March 2020. *See* Exhibit 9 (Search Warrant Affidavit of ATF Special Agent Ryan Hultgren), ¶ 16. On March 17, 2020, Seals purchased three Taurus G2C 9mm pistols from an FFL in Mississippi. Exhibit 1, ¶ 2. One of the Taurus pistols that Seals purchased was recovered three days later in Chicago in connection with the arrest of

3

a convicted felon. A redacted copy of the arrest report is attached as Exhibit 2. At approximately 12:43 a.m. on March 18, a License Plate Reader captured a vehicle in Chicago bearing license plate 2CH1032. Exhibit 10 (Vehicle Detection Report). According to information that ATF obtained from Enterprise Rent-A-Car, on or about March 2, Seals rented a Nissan vehicle in Mississippi bearing license plate 2CH1032. Exhibit 11 (Enterprise Records), p. 1–2. When the Nissan was returned to Enterprise Rent-A-Car on or about March 24, it had been driven approximately 14,225 miles during the rental period.[1] Exhibit 11, p. 2.

### B. Mississippi Targets Deliver Four Firearms to the Chicago Target on April 14, 2020

On April 8, 2020, Chief Judge Rebecca Pallmeyer authorized ATF to obtain prospective GPS location information for Seals's cell phone. A copy of the order is attached as Exhibit 13. Using the GPS location information, ATF observed that his cell phone travelled from Mississippi on April 13 to Chicago on April 14, by way of Arkansas and Missouri. Exhibit 3, ¶¶ 1–2; Exhibit 9, ¶ 20. ATF suspected that he was transporting firearms from Mississippi to Chicago. Exhibit 3, ¶¶ 1–4. Given prior phone contacts between one of the Mississippi targets and Kendall Gamill, ATF

---

[1] License Plate Readers also captured a vehicle, bearing the license plate 2CH1032, in Chicago, Illinois, on March 4, March 5, and March 10. Exhibit 12 (Vehicle Detection Reports). Based on ATF's review of the License Plate Reader photographs, the license plate photographed by the License Plate Reader in Chicago on March 18 (Exhibit 10) appeared to be the same license plate that License Plate Readers photographed in Chicago on March 4, March 5, and March 10 (Exhibit 12).

suspected that the firearms might be getting delivered to Gamill, who resided at 1818 South Hamlin Avenue in Chicago (depicted below). Exhibit 3, ¶¶ 1–4.



*1818 South Hamlin Avenue, Chicago, Illinois[2]*

At approximately 1:25 a.m. on April 14, law enforcement observed a grey Chevrolet Spark with a Georgia license plate park outside of 1818 South Hamlin Avenue. Exhibit 3, ¶ 6. Law enforcement observed James Brandon get out of the Chevrolet Spark and go inside 1818 South Hamlin Avenue. Exhibit 3, ¶ 6. About two minutes later, Brandon exited the building and walked to the car. Exhibit 3, ¶ 6. Brandon then returned to the building and, a few moments later, walked back to the car again. Exhibit 3, ¶ 6. At approximately 1:45 a.m., ATF conducted a traffic stop of the Chevrolet Spark in the vicinity of South Kedzie Avenue and West 30th Street. Exhibit 3, ¶ 8; Exhibit 9, ¶ 22. Seals was in the passenger seat. Exhibit 3, ¶ 8. Brandon was in the driver's seat. Exhibit 3, ¶ 8. ATF interviewed them both on scene. Exhibit 3, ¶ 12; Exhibit 4; Exhibit 5.

---

[2] Screenshot from Google Maps.

Brandon reported that Individual A had directed him to purchase four firearms in Mississippi and sell those firearms to an individual in Chicago whom Brandon knew as "Big Unk." Exhibit 4, ¶ 3. Shown a photograph of Gamill, Brandon identified him as "Big Unk." Exhibit 4, ¶ 3. Brandon said that he drove Seals to an FFL in Mississippi on April 13 to purchase firearms. Exhibit 4, ¶ 5. After purchasing the firearms, they drove from Mississippi to Chicago to sell the firearms to Gamill. Exhibit 4, ¶ 3–5. Brandon, who had $1,400 on him at the time of the interview, reported that Gamill paid him $1,200 for the firearms. Exhibit 4, ¶ 3. Brandon showed ATF text messages that he exchanged with Gamill, which included a photograph of the four firearms that he just sold to Gamill (depicted below). Exhibit 4, ¶ 5.



*Photograph of four firearms that Brandon sent to Gamill on April 13*[3]

---

[3] Exhibit 4, Attachment 3.

Seals said that he purchased three firearms from an FFL in Mississippi on April 13, 2020. Exhibit 5, ¶ 3. Seals said that he rented the Chevrolet Spark that they used to travel to Chicago. Exhibit 5, ¶ 4. When they got to Chicago, Brandon went into an apartment to sell the firearms. Exhibit 5, ¶ 4.

### C. Law Enforcement Recovers One of the Four Firearm from Individual B

At approximately 2:20 a.m. on April 14, law enforcement observed a white Ford Fusion with an Uber placard stop in front of 1818 South Hamlin Avenue. Exhibit 6, ¶ 2. Law enforcement observed two men get out of the Ford Fusion and enter 1818 South Hamlin Avenue. Exhibit 6, ¶ 2. Shortly thereafter, law enforcement observed the same two men exit 1818 South Hamlin Avenue and get into the backseat of a black Acura with an Uber placard. Exhibit 6, ¶ 3. Law enforcement followed the Acura as it drove away from 1818 South Hamlin Avenue and dropped one of the two men off in the vicinity of 1500 South Drake Avenue. Exhibit 6, ¶¶ 3–4.

Law enforcement stopped the Acura in the vicinity of 1516 South Drake Avenue. Exhibit 6, ¶ 4. There were two men in the vehicle, namely, an Uber driver and Individual B, who was in the backseat. Exhibit 6, ¶ 4. The Uber driver provided law enforcement with consent to search the Acura. Exhibit 6, ¶ 4. During the search, law enforcement recovered a firearm under the front-passenger seat, namely, a Taurus G2S 9mm pistol, bearing serial number TLM01549 (depicted below), which was one of the four firearms that the Mississippi targets sold to Gamill that morning

7

at 1818 South Hamlin Avenue.[4] Exhibit 6, ¶ 4. Individual B was arrested and transported to a Chicago Police station for processing. Exhibit 6, ¶ 5. During a post-arrest interview, Individual B denied that the firearm belonged to him. Exhibit 6, ¶ 6.



| *Photograph of the four firearms that the Mississippi targets sold to Gamill* | *Photograph of the firearm that ATF recovered from the Acura* |

### D. Law Enforcement Recovers Another One of the Four Firearms from Jones

At approximately 8:45 a.m. on April 14, Chicago Police Officers Bansley and Huerta observed Gamill exit 1818 South Hamlin Avenue and stand on the front porch. Exhibit 8, ¶ 2. Gamill appeared to be waiting for someone. Exhibit 8, ¶ 2. Gamill went back inside the building and then returned to the front porch. Exhibit 8, ¶ 2. Gamill appeared to be talking on a cell phone. Exhibit 8, ¶ 2. The officers observed a black male with a braided mohawk and a blue jean jacket—later identified as Carnail Jones—walk up to Gamill on the front porch. Exhibit 8, ¶ 3. The officers

---

[4] ATF later determined that Seals purchased the firearm at an FFL in Mississippi on April 13, 2020. *See* Exhibit 14 (ATF Report of Investigation).

observed Jones and Gamill enter 1818 South Hamlin Avenue together; shortly thereafter, the officers observed Jones and Gamill exit 1818 South Hamlin Avenue together. Exhibit 8, ¶¶ 3–4. While Jones and Gamill conversed with each other on the front porch, the officers observed Jones adjust what appeared to be a large object above his midsection with his left hand. Exhibit 8, ¶ 4. Jones left the front porch by himself and headed southbound on Hamlin Avenue. Exhibit 8, ¶ 4. As Jones walked toward the east side of the street, the officers lost sight of him. Exhibit 8, ¶ 4.

Soon thereafter, Officers Bansley and Huerta observed a blue vehicle that had been parked on the east side of Hamlin Avenue—later identified as a blue Toyota Corolla—drive away from the area. Exhibit 8, ¶ 5. Law enforcement maintained surveillance on the Toyota Corolla as it headed southbound on Hamlin Avenue, eastbound on West 19th Street, northbound on South Ridgeway, and then westbound on West 18th Street. Exhibit 8, ¶ 5. As the Toyota Corolla travelled westbound on West 18th Street, ATF Special Agent Sheehan observed that the driver was a black male with a braided mohawk-type hairstyle, which matched the description of the individual who had just met with Gamill. Exhibit 8, ¶ 5.

At approximately 8:55 a.m., law enforcement pulled over Jones's Toyota Corolla in the vicinity of 3955 West 18th Street, which is approximately 0.3 miles from 1818 South Hamlin Avenue. Exhibit 8, ¶¶ 6–7; Exhibit 15 (Chicago Police Department Arrest Report). Jones, who had a braided mohawk and was wearing a blue jean jacket, was seated in the driver's seat. Exhibit 8, ¶ 7. No one else was in the

9

car. Exhibit 8, ¶ 7. ATF Task Force Officer Fahey asked Jones to get out of the car. Exhibit 8, ¶ 7. After Jones got out of the car, Task Force Officer Fahey asked Jones, "You have anything on you?" Exhibit 8, ¶ 7. While motioning toward his right side with his head, Jones responded, "Yeah, in my pocket." Exhibit 8, ¶ 7. When he patted down the right upper side of Jones's midsection, Task Force Officer Fahey felt a firearm inside Jones's jacket. Exhibit 8, ¶ 7. Task Force Officer Fahey proceeded to recover a firearm from Jones's jacket pocket, namely, a loaded Ruger P95DC nine-millimeter pistol, bearing serial number 31110948. Exhibit 8, ¶ 7; *see also* Exhibit 7 (Photograph of Firearm).

Jones was placed into custody and transported to a police station. Exhibit 8, ¶ 8; Exhibit 15, p. 2. After being provided with, and acknowledging his understanding of, his *Miranda* warnings, Jones agreed to speak with law enforcement. Exhibit 8, ¶ 9. During the interview, Jones reported that he purchased the Ruger pistol for $450 from an individual he knew as "K" at 1818 South Hamlin Avenue. Exhibit 8, ¶ 9. Jones acknowledged that he was a felon and knew that he was prohibited from possessing a firearm. Exhibit 8, ¶ 9.

## II.   ARGUMENT

The court should deny Jones's motion to suppress without an evidentiary hearing. Law enforcement had reasonable suspicion to conduct an investigatory stop and protective pat-down search of Jones following his participation in an illegal firearms transaction.

Prior to the stop and protective pat-down search, law enforcement was aware of the following: That morning, Mississippi targets of ATF's firearms trafficking investigation sold four firearms to the Chicago target at 1818 South Hamlin Avenue. Exhibit 3, ¶¶ 6; Exhibit 4, ¶¶ 3–5; Exhibit 5, ¶¶ 3–4. About an hour later, two men briefly went inside 1818 South Hamlin Avenue and then departed from the scene in an Uber. Exhibit 6, ¶¶ 2–3. When law enforcement pulled over and searched the Uber, they recovered one of the four firearms that the Mississippi targets had just delivered to the Chicago target. Exhibit 6, ¶ 4. Considering these events, law enforcement reasonably believed that the Chicago target was in the process of distributing the four firearms that morning.

When law enforcement then observed Jones meet briefly with the Chicago target at 1818 South Hamlin Avenue, law enforcement reasonably suspected that Jones had just engaged in an illegal firearms transaction. In turn, law enforcement had a reasonable basis for conducting an investigatory stop of Jones's car. After Jones got out of the car, Task Force Officer Fahey asked Jones, "You have anything on you?" Exhibit 6, ¶ 7. Given that Jones had just engaged in an apparent firearms transaction, Jones's response—"Yeah, in my pocket" (Exhibit 8, ¶ 7)—provided Task Force Officer Fahey with a reasonable basis for suspecting that Jones was armed, justifying the ensuing limited protective pat-down search that resulted in the recovery of a loaded firearm from Jones's jacket pocket. Exhibit 8, ¶ 7. Accordingly,

there is no basis for suppressing the firearm that was recovered from Jones that day, or Jones's subsequent confession to being a felon in possession of a firearm.

### A. Jones Has Failed to Identify a Material Disputed Fact Necessitating a Hearing.

In his motion, Jones requests that the court "conduct an evidentiary hearing to suppress from the introduction into evidence the firearm law enforcement officers obtained" from him. Motion, pp. 1, 16. However, Jones does not identify any specific disputed issue of material fact that would necessitate an evidentiary hearing.

"Evidentiary hearings on motions to suppress are not granted as a matter of course but are held only when the defendant alleges sufficient facts which if proven would justify relief." *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). "District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011). A defendant bears the burden of not only identifying a definite disputed factual issue but also demonstrating its materiality. *Id.; see also United States v. McGaughy*, 485 F.3d 965, 970 (7th Cir. 2007) ("Our precedent places the onus on a defendant seeking an evidentiary hearing to 'specifically . . . allege[ ] a definite disputed factual issue,' and to demonstrate its materiality.") (citations omitted); *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir. 1995) ("That burden could be met only upon the presentation of 'definite, specific, detailed, and nonconjectural' facts.") (quoting *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1995)).

Jones's motion—to which no affidavit was attached—does not address, let alone contest, any of the facts concerning the investigation that preceded the recovery of a loaded firearm from Jones's jacket pocket. Instead, Jones's discussion of the facts begins with law enforcement's observation of Jones approaching Gamill's apartment building. Jones does not identify any factual disputes concerning law enforcement's observation of his meeting with Gamill that morning, the stop of his car, or his interaction with Task Force Officer Fahey. *See* Motion, pp. 1–2. As there is no material factual dispute that would necessitate an evidentiary hearing, Jones's request for a hearing should be denied. *See Coleman*, 149 F.3d at 677; *see also United States v. Rollins*, 862 F.2d 1282, 1291 (7th Cir. 1989) (affirming district court's denial of request for evidentiary hearing where defendant had "not met the burden of establishing the necessity of a hearing").

**B.    Law Enforcement Had Reasonable Suspicion to Stop and Search Jones Based on His Participation in an Illegal Firearms Transaction.**

Law enforcement had reasonable suspicion to conduct an investigatory stop of Jones, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), following Jones's participation in an illegal firearms transaction. "A *Terry* investigative stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States v. Bullock*, 632 F.3d 1004, 1014–15 (7th Cir. 2011). As the Supreme Court explained, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for

13

suspecting the particular person stopped' of breaking the law." *Hein v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). The Seventh Circuit has "consistently held that officers may conduct an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006); *see also United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010) (law enforcement officers may detain a suspect for a brief investigatory stop if they have "reasonable suspicion based on articulable facts that a crime is about to be or has been committed"). "Reasonable suspicion is more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'" *United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

"Reasonable suspicion does not deal with hard certainties, and 'behavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play.'" *United States v. Fiasche*, 520 F.3d 694, 697 (7th Cir. 2008) (quoting *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005)). Reasonable suspicion "can arise from behavior that may in other circumstances be considered innocent; in other words, context matters." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (quoting *Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014); *see also United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019) ("[W]hen evaluating 'the reasonableness of a police

14

intrusion, [courts] look at the totality of circumstances and 'must not be overly focused on any one factor.'") (quoting *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000)); *Carlisle*, 614 F.3d at 755 ("The suspicious conduct may be ambiguous and susceptible to an innocent explanation, but the officers may detain the individual to resolve such ambiguity."); *Lawshea*, 461 F.3d at 859 ("[W]e recognize that certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play."). "Ultimately, a court's determination of reasonable suspicion 'must be based on common-sensical judgments and inferences about human behavior.'" *Baskin*, 401 F.3d at 791 (quoting *Wardlow*, 528 U.S. at 125).

Based on facts collectively known by the agents and officers on scene that day, law enforcement had specific and articulable reasons for suspecting that Jones had participated in an illegal firearms transaction with Gamill at 1818 South Hamlin Avenue. *See United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) ("When law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine."); *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992) ("[W]hen officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed."). As such, law enforcement was permitted to conduct a *Terry* investigative stop to determine

15

whether Jones had, in fact, just purchased a firearm from Gamill. *See United States v. Miranda–Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016) ("[A] stop conducted in the face of ambiguity is permissible so long as it remains sufficiently probable that the observed conduct suggests unlawful activity.").

In connection with the investigatory stop, law enforcement was permitted to order Jones to get out of the car. *See United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) ("Passengers may . . . be ordered out of the vehicle 'as a matter of course' during a traffic stop.") (citing *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997)); *see also Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002) ("[P]olice officers are permitted to order a driver to exit his or her vehicle during the course of an investigatory stop."); *United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir. 1999) ("[P]olice officers may ask passengers to step out of a vehicle during a *Terry* stop.").

Given the totality of the circumstances, Task Force Officer Fahey had a reasonable basis for conducting a limited, protective pat-down search of Jones for a weapon. As the Seventh Circuit has recognized, "[t]raffic stops are dangerous for officers and the 'legitimate and weighty' interest in officer safety allows officers to perform protective searches and frisks of other passengers." *United States v. Cherry*, 920 F.3d 1126, 1139 (7th Cir. 2019) (quoting *Arizona v. Johnson*, 555 U.S. 323, 331 (2009)); *see also Michigan v. Long*, 463 U.S. 1032, 1047 (1983) ("[I]nvestigative detentions involving suspects in vehicles are especially fraught with danger to police officers."). During an investigatory stop, an officer may "conduct a protective pat down

16

when confronting facts and circumstances giving rise to a reasonable suspicion that the individual has a weapon and otherwise poses a danger." *United States v. Adair*, 925 F.3d 931, 937 (7th Cir. 2019) (citing *Terry*, 932 U.S. at 27); *see also United States v. Ford*, 872 F.3d 412, 414 (7th Cir. 2017) ("A police officer conducting an investigatory stop may frisk the suspect for weapons if the officer has an objectively reasonable suspicion that the suspect might be armed.").

"A police officer 'need not be absolutely certain that the individual is armed' because 'the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Brown*, 232 F.3d 589, 593 (7th Cir. 2000) (quoting *Terry*, 392 U.S. at 27). Officers are permitted to take reasonable steps to ensure their own safety, so long as the search is "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer." *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (citing *Terry*, 392 U.S. at 30). This includes conducting a pat-down search of the outer clothing of the stopped individual. *Id.*

This type of limited pat-down search is precisely what occurred here. After Jones got out of the car, Task Force Officer Fahey asked Jones, "You have anything on you?" Exhibit 8, ¶ 7. While motioning toward his right side with his head, Jones responded, "Yeah, in my pocket." Exhibit 8, ¶ 7. Given that law enforcement had just observed Jones engage in an apparent firearms transaction with Gamill, Jones's

17

response provided Task Force Officer Fahey with specific and articulable reasons for suspecting that Jones was armed and for conducting a limited pat-down search for a firearm. During the ensuing pat-down search, Task Force Officer Fahey felt a firearm inside Jones's jacket. Exhibit 8, ¶ 7. Task Force Officer proceeded to recover a loaded firearm from Jones's jacket pocket. Exhibit 8, ¶ 7. Given the ease with which Jones could have removed the loaded firearm from his jacket and used it against the officers, a limited pat-down search for weapons was a reasonable and prudent course of action for Task Force Officer Fahey to take in order to ensure his safety and the safety of his fellow officers.

The totality of the circumstances provided law enforcement with a reasonable basis for conducting an investigatory stop and protective search for weapons. Law enforcement properly seized the loaded firearm from Jones's jacket pocket. Accordingly, there is no factual or legal basis for suppressing the firearm or Jones's ensuing confession to being a felon in possession of the firearm.

### III. CONCLUSION

For the foregoing reasons, the government respectfully requests that the court deny Jones's motion to suppress.

                Respectfully submitted,

                JOHN R. LAUSCH, JR.
                United States Attorney

By:   /s/ Jared C. Jodrey
       JARED C. JODREY
       Assistant United States Attorney
       United States Attorney's Office
       219 South Dearborn Street, 5th Floor
       Chicago, Illinois 60604
       312-353-5358